```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
       ------------------------------------------------------------
 3                                  )
       Venedia Larita Campbell and  )  File No. 24-CV-913
 4     Martin Alan Smith, II,       )          (KMM/DJF)
                                    )
 5            Plaintiffs,           )
                                    )  Minneapolis, Minnesota
 6     vs.                          )  August 6, 2024
                                    )  10:10 a.m.
 7     Andrew William Schroeder, Kyle )
       Allen Williams, Paul Franz   )
 8     Albers, Robert Aaron Greer,  )
       Drew Scott Clark, John Cameron )
 9     Haugland, in their individual )
       capacities, City of          )
10     Minneapolis, and Ramsey      )
       County,                      )
11                                  )
              Defendants.           )
12     ------------------------------------------------------------

13           BEFORE THE HONORABLE KATHERINE M. MENENDEZ
                UNITED STATES DISTRICT COURT JUDGE
14                       (MOTION HEARING)

15     APPEARANCES:
       For the Plaintiffs:       Law Office of Eric A. Rice, LLC
16                               ERIC A. RICE, ESQ.
                                 1 West Water Street
17                               Suite 275
                                 St. Paul, Minnesota 55107
18
       For the Defendants:       Minneapolis City Attorney's
19                               Office
                                 TRACEY N. FUSSY, ESQ.
20                               350 South Fifth Street
                                 Suite 210
21                               Minneapolis, Minnesota 55415

22     Court Reporter:           PAULA K. RICHTER, RMR-CRR-CRC
                                 300 South Fourth Street
23                               Minneapolis, Minnesota 55415

24
           Proceedings reported by certified stenographer;
25     transcript produced with computer.
```

```
1                    P R O C E E D I N G S
2                      IN OPEN COURT
3              THE COURT:  Good morning, everybody.  Let's go
4    ahead and get started by getting appearances on the record,
5    first on behalf of the plaintiff.
6              MR. RICE:  Eric Rice on behalf of the plaintiffs.
7              THE COURT:  All right.  Good morning, Mr. Rice.
8              And here on behalf of the Minneapolis defendants.
9              MS. FUSSY:  Tracey Fussy, Your Honor.
10             THE COURT:  Great.  Welcome.
11             And on behalf of -- is it Ramsey County?
12             MR. PLAISANCE:  Yes, Your Honor.  Good morning.
13   Kevin Plaisance on behalf of Ramsey County.
14             THE COURT:  And can you spell your last name for
15   me?
16             MR. PLAISANCE:  P-L-A-I-S-A-N-C-E.
17             THE COURT:  Okay.  And do you intend to offer any
18   argument?
19             MR. PLAISANCE:  No, Your Honor.
20             THE COURT:  Okay.  You're sort of, no disrespect,
21   but riding Ms. Fussy's coattails?
22             MR. PLAISANCE:  Yes, Your Honor.
23             THE COURT:  Okay.  Very good.
24             Let's go ahead and start with you, Mr. Rice.  I
25   think you've argued to me before.  I tend to do this with
```

1     just a whole bunch of questions.

2               MR. RICE:  Yes, Your Honor.  I'm happy to defer to

3     the Court's questions and go on the topics that the Court

4     wants.

5               THE COURT:  Okay.  Great.

6               So I am certainly allowed, if not required, to

7     note the objective reality of the location of both the phone

8     and the mower from the video, correct?

9               MR. RICE:  I believe so, Your Honor.  So the

10     objective location of those items would be different than

11     what the officer reasonably would have known, and that would

12     be compared to what was put on the affidavit, Your Honor.

13               THE COURT:  Right.  But at least with respect to

14     the telephone, the objective location is captured on Officer

15     Schroeder's own body cam video, correct?

16               MR. RICE:  Well, to the best of our knowledge,

17     Your Honor.  And I want to address that video because it

18     starts about an hour after they first observed the vehicle,

19     and it stops about an hour before the search warrant

20     affidavit is prepared.  And in those gaps, we don't know if

21     officers moved the phone, if Officer Schroeder communicated

22     different information about where the phone was originally

23     at.

24               THE COURT:  But under this theory, anybody always

25     could ever perpetually allege a false search warrant because

1    they could just simply say, oh, sure, the video shows the

2    gun in X place, but we don't know if it was moved.  And that

3    would be, under your suggested hint there, enough to survive

4    a motion to dismiss.

5          MR. RICE:  Well, in this matter, I will say that

6    we're on a motion to dismiss posture, so this is not summary

7    judgment.  The plaintiffs have not had the benefit of

8    engaging in discovery.  All plaintiffs need to allege is a

9    reasonable, plausible possibility that the phone was not as

10   the officers described or the location of the phone as

11   captured on the video does not support the officers' arrest

12   and search of the plaintiffs' home.

13         THE COURT:  Okay.  But my question is much more

14   focused.  You are not alleging anywhere in your complaint

15   that I can see that the phone was found anywhere other than

16   what was shown on Officer Schroeder's body cam video,

17   correct?

18         MR. RICE:  Correct.  It's not affirmatively

19   alleged, but we ask the Court that it be a reasonable

20   inference that the phone may have been moved or that Officer

21   Schroeder had different information about the phone --

22         THE COURT:  Isn't this precisely what *Iqbal*

23   counsel is against in terms of assuming really malicious

24   intent?  I mean, it's one thing for you to highlight

25   correctly -- I have lots of questions about this -- that the

1    location of the phone was somewhat mischaracterized in the

2    search warrant.  It's another thing for you to add on this

3    whole layer of, and who knows, it could have been anywhere,

4    which is what you're asking me to do now without it being

5    alleged and with me having body cam video showing where it

6    at least appears to be discovered.

7            Under that sort of idea, every search warrant

8    ever, every body cam video ever, it's all for grabs.

9            MR. RICE:  Not necessarily, Your Honor.  And I

10   would point the Court to the beginning of the --

11           (Court reporter interruption.)

12           MR. RICE:  I would direct the Court to the

13   beginning of the body camera video where Officer Schroeder

14   himself says that the phone was in the alley.  We don't know

15   how he got that information, if the phone may have

16   originally been fully in the alley and may have been handled

17   by officers.  So this is not a case where there is literally

18   no evidence, no possibility.

19           Here, Officer Schroeder himself on the video says,

20   "The phone was in the alley," as the video starts, and that

21   allows the plaintiffs to claim a reasonable inference that

22   the phone may have actually been in the alley before the

23   video recording started.  And we'd ask the Court to draw

24   that inference in favor of the plaintiffs at this stage.

25           Obviously, if summary judgment reveals that

1    Officer Schroeder did not actually receive any information

2    and is maybe a bit loose with his characterization or was

3    told the phone was in the alley but the officers on scene

4    didn't handle the phone, then on summary judgment, that

5    would be a different issue.

6            But here today, we don't have the benefit of

7    deposing the Ramsey County officers.  As the Court has seen,

8    the plaintiffs have made good faith and diligent efforts to

9    get as many records available as possible, to come to the

10   Court with the best possible allegations, but the issue is

11   that the plaintiffs have been litigating this case for a

12   year and a half.  They brought a lawsuit against the City.

13   The City, even though ordered to disclose relevant records,

14   did not.  The video that's attached to the answer here,

15   which I think the parties would not dispute is relevant, was

16   not disclosed by the City pursuant to the previous order --

17           THE COURT:  Okay.  But we've got it now.  I mean,

18   I recognize you're raising a general obstruction suggestion,

19   but right now we have the video.  And the video starts when?

20           MR. RICE:  About an hour after Schroeder and

21   Williams first observed the men near the vehicle.

22           THE COURT:  Okay.  And you are suggesting that

23   your complaint supports an inference that we -- that the

24   video doesn't actually capture the original location of the

25   phone, or necessarily so.  And for support for this, you

1    point to both the incomplete timing of the video and the

2    fact that he originally is heard saying -- "he," being

3    Officer Schroeder -- "The phone was found in the alley."

4          MR. RICE:  That's correct, Your Honor.  If Officer

5    Schroeder says that the phone was found in the alley, then

6    the plaintiffs should be entitled to an inference that the

7    phone was in the alley.

8          THE COURT:  Okay.  So the idea, you know, from

9    *LeMay vs. Mays* is that videos are relevant but not

10   necessarily that we have to assume that they say what the

11   defendants say they say.

12         MR. RICE:  My understanding of how videos are to

13   be treated at this stage, Your Honor, is that what they show

14   is generally conclusive unless the video has been modified.

15   But as to what they don't show, from other perspectives,

16   what's not captured, and there's case law that events

17   outside the time of the video, inferences need to be drawn

18   in favor of the plaintiffs here.

19         THE COURT:  Okay.  Do you have a case where motion

20   to dismiss is denied in a false statement in a search

21   warrant context?

22         MR. RICE:  Off the top of my head, Your Honor, I

23   don't have that available.  I'd be happy to supplement for

24   the Court.

25         THE COURT:  No.  I mean, you had your briefing.

1           Do you have a case where summary judgment is

2    denied in a motion -- in a false statement context like

3    this, a false statement in a search warrant context?

4           MR. RICE:  I believe I have the cases cited in the

5    brief, Your Honor.  I don't have materials beyond that.

6           THE COURT:  Okay.  Would you agree that the

7    framing that I've got to grapple with here in the qualified

8    immunity context is:  Was it clearly established that an

9    officer who applies for a warrant using a deliberate

10   falsehood or in reckless disregard of the truth violates the

11   Fourth Amendment?

12          MR. RICE:  I believe that's generally correct,

13   Your Honor.

14          THE COURT:  Okay.  And there seems to be no

15   dispute that that is clearly established.

16          MR. RICE:  Correct.  Even in the cases that have

17   found in favor of the defendants, that is the standard

18   courts have enunciated for decades.

19          THE COURT:  So here, it isn't a case of whether

20   the law is clearly established, like we sometimes see in the

21   qualified immunity context.  It's a case of, are there

22   sufficient allegations from which I could, taking all

23   inferences in favor of the plaintiff, find that the officer

24   employed deliberate falsehoods or applied for the warrant in

25   reckless disregard of the truth.

1            MR. RICE:  I believe that's generally the issue,

2      Your Honor.  I think my understanding of the issue in this

3      case is, how much allegation or factual matter is sufficient

4      to proceed at this stage?  And the plaintiffs would ask the

5      Court to say that this is not a case where the plaintiffs

6      have just baldly alleged that because they disagree with

7      what happened, that it must have been false or there must

8      have been bad faith.

9            The plaintiffs have reviewed the records.  They've

10     brought a lawsuit about the records.  They have obtained

11     much information.  And here we have circumstantial evidence

12     at least that the officers engaged in intentionally false

13     representations, and we'd ask the Court just to allow

14     discovery to occur.  Again --

15            THE COURT:  So I also have to apply the overlay of

16     if I -- I have to draw inferences in favor of the plaintiff,

17     but under *Iqbal*, they have to be plausible and not legal

18     conclusions.  So *Iqbal* deals with allegations that people

19     must have known what was happening in certain contexts and

20     conspired, and the Court in *Iqbal* really rejects the idea

21     that just asserting those things is enough.

22            So here I have to look at the specific alleged

23     falsehoods and if I find that they are, you know, credible

24     based on the allegations in the complaint, combined with the

25     video, then I remove those falsehoods from the warrant or I

1    substitute in the correct not recklessly articulated

2    evidence.  And you only state a claim if the corrected

3    affidavit, as it were, fails to establish probable cause,

4    correct?

5              MR. RICE:  Essentially, Your Honor.  And that's

6    with the search.  That's separate from the arrest claims.

7              THE COURT:  But the arrest claim, I'm looking at

8    the full universe of the information known as correct.  So

9    if I find, for instance, that the corrected search warrant,

10   even crediting that there are some falsehoods, still

11   establishes probable cause, I grant the motion to dismiss on

12   the search warrant claims.

13             MR. RICE:  Essentially, Your Honor, but I believe

14   there would be a different standard to search the

15   plaintiffs' home versus arrest the plaintiffs themselves.

16             THE COURT:  And for arresting the plaintiffs

17   themselves, what's written in the affidavit is utterly

18   irrelevant.  Instead, the lens that I have to apply is what

19   was known to the collective officers at the time.

20             MR. RICE:  Essentially, Your Honor.

21             THE COURT:  Okay.

22             MR. RICE:  And I'd just note that because there's

23   about an hour gap -- the search warrant affidavit was

24   prepared about an hour after the plaintiffs were arrested --

25   and so the arrest was made on less information.  And the

1    plaintiffs' position is that even if the Court were to find

2    that there was sufficient cause to search the plaintiffs'

3    home, nothing connected the plaintiffs themselves to this

4    incident and their arrest was unlawful.

5          THE COURT:  Okay.  The arrest happened and then an

6    hour passes and then the application is filed.

7          MR. RICE:  That's my understanding, Your Honor.

8    The arrest of Mr. Smith.  I believe Ms. Campbell came out a

9    bit later.  But, again, I don't have all of that information

10    because the City has not made it available.

11          THE COURT:  Okay.  You suggest this theory, this

12    alternative exculpatory theory, about the location of the

13    property being consistent with driving down the alley and

14    discarding items.  But we're all pretty aware that the case

15    law doesn't require an officer to include an alternative

16    exculpatory theory in a search warrant, right?

17          MR. RICE:  There's case law that requires an

18    officer to consider mitigating or exculpatory evidence.

19          THE COURT:  Right, but they don't have to come up

20    with an alternative theory.  I mean, there's a difference

21    between mitigating evidence, like an eyewitness who says it

22    wasn't him, and, hmm, if I were a defense attorney, I could

23    argue that these things were discarded by somebody, you

24    know, riding down the alley.

25          Do you have a case that suggests that an officer

1    has to include an alternative exculpatory theory?

2            MR RICE:  We're not looking for an alternative

3    exculpatory theory, Your Honor.  What we're asking is that

4    the officers consider the totality of the evidence and

5    consider the mitigating circumstances of the evidence.

6            Here, if there had been only a cell phone found

7    near the plaintiffs' driveway, that would be materially

8    different than also finding the lawnmower a yard over and

9    finding the truck at the end of the alley in the parking

10   lot.

11           What the plaintiffs are --

12           THE COURT:  But the truck at the end of the alley

13   is in the affidavit.

14           MR. RICE:  And what we're asking the Court to

15   consider is not that the officers must come up with some

16   mitigating theory and play defense lawyer, but they have to

17   consider that the phone and the lawnmower and --

18           THE COURT:  Do you have any authority for the idea

19   that this is the standard for suing a law enforcement

20   officer?  Not that they excluded exculpatory evidence, but

21   that they failed to consider an alternative theory that

22   might explain the evidence that they did include.

23           MR. RICE:  Well, again, Your Honor, we're not

24   asking them to consider the theory.  That's, I believe,

25   outside the objective analysis of the evidence.

 1          What we're asking the Court is to consider the

 2     evidence in totality.  If you have those three pieces of

 3     evidence, do they sufficiently point to the plaintiffs and

 4     their property as being criminally involved, and our

 5     position is you can't do that with the three locations on a

 6     path.  If anything, the apartment would have the strongest

 7     connection because the truck was parked there.  The next

 8     would be the mower, and then the next would be the cell

 9     phone that was found in the public area outside the private

10     area of the plaintiffs' property.

11          THE COURT:  So let's talk about the dog because

12     you repeated -- you say that I should infer that Schroeder

13     saw the dog.  I'm not sure if it matters if Schroeder saw

14     the dog.

15          You also say that Williams knew that the dog

16     wasn't one of the three dogs in the backyard.

17          MR. RICE:  Correct, Your Honor.

18          THE COURT:  You just say that.

19          MR. RICE:  Well, we allege that.  We allege that

20     based on the fact that it's undisputed that the plaintiffs'

21     dog was not the one seen at the vehicle.

22          THE COURT:  Okay.  But we have 1:00 a.m.  We have

23     three barking dogs in the back.  We have surveillance at

24     night of a dog.  No color, description.  Just a size.

25          I am supposed to assume that because it is not the

1    right dog, that the officer knew it was not the right dog.

2         MR. RICE:  That is an allegation and an inference

3    that the plaintiffs are entitled to based on the

4    circumstantial evidence.

5         THE COURT:  Distinguish *Iqbal* on this point,

6    because *Iqbal* really drills down on this, "They knew.  They

7    knew what was going on."  It says that that is not enough to

8    simply allege it.  It characterizes some of that as a legal

9    conclusion.

10        Help me distinguish *Iqbal* on the point that

11   Williams knew it was the wrong dog.

12        MR. RICE:  Certainly, Your Honor.  So the case law

13   is clear, though, that you can prove these sorts of things

14   through circumstantial evidence.  We don't need a report

15   saying -- you know, with hidden cameras saying Williams knew

16   it was the wrong dog.  But we do have circumstantial

17   evidence.

18        The circumstantial evidence is that Schroeder and

19   Williams were observing the victims' vehicle.  Williams then

20   claims that some people with a dog go to the vehicle.  Then

21   separately -- and, again, we don't have full information on

22   this point -- but Williams claims that he is 100 percent

23   certain that the dog in the plaintiffs' backyard is the one

24   seen by the vehicle.

25        THE COURT:  Does he say, "100 percent certain"?

1              MR. RICE:  Well, on Schroeder's body cam, another

2      officer relays that to Schroeder in the alley.

3              THE COURT:  He says, "100 percent certain"?

4              MR. RICE:  Correct.

5              THE COURT:  He said -- Williams said he's 100

6      percent certain.

7              MR. RICE:  Correct.  So in the alley --

8              THE COURT:  Okay.  And so you want me to infer

9      somehow that that's a lie.  So distinguish *Iqbal* on this

10     very point, on the knowingly lied.

11             MR. RICE:  Because it wasn't the same dog.

12     Nobody --

13             THE COURT:  I understand that.  I understand it's

14     not the same dog.  I mean --

15             MR. RICE:  So there's that fact, that that is not

16     the same dog, and the circumstantial evidence and intent is

17     that you have two officers, Schroeder and Williams, who are

18     determined to get into somebody's house and to make arrests

19     in this case.  Schroeder is determined to get into the

20     plaintiffs' home based on false and incorrect information.

21     The video shows that he wrongly believes that this is a

22     north side gang member's house.  He is with Williams about

23     an hour before, and there may be discussions an hour

24     afterward, but the officers collectively had an intent at

25     any point -- or at any purpose to get into this home.

1          And so the circumstantial evidence we'd ask the

2     Court to draw is that the plaintiffs' dog was not, in fact,

3     seen by the vehicle; that Williams did not denote any sort

4     of doubt about the dog being seen at the vehicle; and that

5     he was working with Schroeder, who had a mutual purpose to

6     get in the plaintiffs' home and make arrests based on this

7     incorrect information that it was a north side gang member's

8     house.

9          THE COURT:  Let's say they had a mutual purpose to

10    get inside the home.  You expect me to infer from that goal

11    to get inside the home.  Let's say their purpose is that

12    they believe that these people were involved in the

13    shooting.  Then I infer lies.

14         MR. RICE:  Well, yes, Your Honor.  They made the

15    lies in order to support getting in the home.  You can see

16    on Schroeder's video even, he wants to go in the house.  He

17    asks the supervisor, "Can we just go in?"  And the other

18    officer says, "No.  We need a search warrant."  And so

19    Schroeder drafts one based on --

20         THE COURT:  Right, I've got it.  You make a strong

21    case for their desire to get in the house.  How am I

22    supposed to assume he's lying?  I'm supposed to assume from

23    his desire to get into the house, that when he looks through

24    the fence in the middle of the night, sees three dogs and

25    says, "I'm 100 percent sure one of those dogs is the dog I

1    saw across the parking lot," that is a lie?

2          MR. RICE:  So if you have someone's intention to

3    get to an objective and a person saying false information to

4    get to that objective, I think the plaintiffs are well

5    within their rights to say that that is an adequately

6    pleaded lie or false allegation.  Otherwise, again, the

7    Court would essentially be requiring not circumstantial

8    evidence but --

9          THE COURT:  Slow down, please.

10          MR. RICE:  -- direct evidence.

11          THE COURT:  Ms. Fussy cites one of the cases --

12    and I'm not sure it really applies here; it's one of the

13    things I'm going to talk to her about -- about the idea that

14    subjective intent of the officers is irrelevant.  It feels

15    like we're entirely in complete subjective intent land when

16    we're trying to decide whether someone lies.

17          So what do you think about the authority that she

18    cites on that point?

19          MR. RICE:  Well, the case law is a little

20    confusing, but my understanding would be it's an objective

21    analysis, and so if objectively it's a deliberate

22    falsehood --

23          THE COURT:  Yeah.  How does that work?

24          MR. RICE:  But kind of like the recent Fourth

25    Amendment seizure cases where there's an objective

1    manifestation of, you know, dispersing versus seizing, I

2    would say here's that's my understanding of what the

3    plaintiffs need to hit is kind of an objective manifestation

4    of a false representation.  We don't actually need to know

5    whether Williams objectively lied or not, but if it looks

6    like a lie, if it objectively manifests as a lie, then the

7    plaintiffs have successfully pleaded a claim.

8           THE COURT:  How am I supposed to apply "doesn't

9    matter if he lied" when the standard is "deliberate

10   falsehood?"

11          MR. RICE:  If there's an objective deliberate

12   falsehood, then I think we've reached the standard.  But I'm

13   not quite certain as to how to square --

14          THE COURT:  Yeah, I'm not either.  I don't think

15   it squares very well, honestly.  I think that in a case

16   where the standard is deliberate falsehood and reckless

17   disregard, these cases about subjective intent are somewhat

18   less helpful than in other contexts, like would a reasonable

19   officer think certain conduct is excessive force.

20          MR. RICE:  Well, and it's challenging, Your Honor.

21   But I also do want to go back briefly to Williams'

22   representations as well.  I think this would be a different

23   matter if Williams said, "I think it was the same dog," or

24   "It appears to be the same dog, but I'm not certain."  I

25   believe that would show some doubt and some recognition that

1    it could be false, but I'm not trying to do so in bad faith;

2    I'm not trying to make a falsehood in order to support this.

3            THE COURT:  So his certainty supports, in your

4    inference, bad faith.

5            MR. RICE:  Exactly, Your Honor, because that's --

6            THE COURT:  But the Supreme Court has said that in

7    the context of eyewitness identification, despite

8    significant scientific evidence to the contrary, that

9    certainty is a factor that actually supports the viability

10    of an identification.

11            Why wouldn't his certainty actually support his

12    not acting with deliberate disregard?

13            MR. RICE:  Well, this is a disputed fact issue.

14    Is the fact that he claims he is certain a good-faith

15    mistake or is it a manifestation of his intentional lie?

16            THE COURT:  Okay.  Does *Leon* apply here?

17            MR. RICE:  I'm sorry.  What, Your Honor?

18            THE COURT:  *Leon*.  The *Leon* good-faith analysis in

19    the Federal Fourth Amendment.  Since I am applying the

20    Federal Fourth Amendment, does *Leon* apply in the false

21    search warrant context?  I think that's your claim too.

22            MR. RICE:  Yeah, I don't believe so, Your Honor.

23    Here we're not alleging that the officers somehow made a

24    mistake or were disconnected.  Here we're arguing that

25    Schroeder is kind of in the center of things.  It's not good

1    faith to conspire and cause a lie and rely on something you

2    know is a lie.

3            THE COURT:  So your point is maybe -- even if the

4    *Leon* framework is relevant, this falls into one of the

5    classically on exceptions where the person knows that the

6    warrant was issued based on falsehood.

7            MR. RICE:  That's exactly what the plaintiffs are

8    alleging, Your Honor.  And to be clear, and what they're

9    alleging is that Schroeder knew the information was false

10   and conspired with Williams in order to make that false

11   information, you know, occur.

12           THE COURT:  Is there any gatekeeping that I get to

13   perform at all, given *Iqbal* and *Twombly?*  Let's imagine that

14   every search warrant that turns out not to find anything and

15   the people turn out to be innocent then become subject to a

16   lawsuit on the ground that all of those things were lies.

17   Where is the gatekeeping there?  What vehicle do I use to

18   make sure there's more than that?

19           MR. RICE:  Well, I think, again, you look at the

20   classic indicators of conspiracy and fraud.  What was the

21   intention of the officers?  What was reasonably known to

22   them?  What did they disclose?  What did they not disclose?

23   And --

24           THE COURT:  But let's imagine a case where

25   somebody doesn't have videos and they just say, you know,

     1    the search warrant affidavit said that they saw me do X and

     2    they found Y plainly visible through my window and then Z on

     3    surveillance, and all of those things are lies, and they

     4    knew they were lies.  I am suing you under 1983.

     5         Is just asserting that they are lies enough?

     6         MR. RICE:  No.  But I believe in the Court's

     7    hypothetical, if an officer did observe something false and

     8    then -- or observed A but then described B, that would be

     9    enough at this stage.  Again, the whole purpose of this

    10    litigation is to allow the plaintiffs to move forward to

    11    discovery to find out information and to resolve --

    12         THE COURT:  But in the dog context, this is

    13    exactly what you're doing.

    14         In the phone context, you've got a point.  The

    15    phone is clearly on this line that is right between driveway

    16    and alley.

    17         The mower is certainly not in the rear of their

    18    house.

    19         But the dogs, you're just expecting me to accept

    20    because you say he must be lying, that he is lying.

    21         MR. RICE:  What we're arguing is that he had

    22    direct observation of that situation.  This is not a

    23    situation where he misinterpreted data or surveillance video

    24    or got an incomplete report.

    25         THE COURT:  So because he saw it and is wrong, it

1    must have been a lie?

2              MR. RICE:  Not it must have been.

3              THE COURT:  A dog misidentification.

4              MR. RICE:  But the plaintiffs are allowed to

5    proceed on their claim because that is enough, with

6    inferences and circumstantial evidence, to plead a claim

7    that this officer made an intentional falsehood.  Otherwise,

8    if we were to have to prove our case beyond a reasonable

9    doubt defeating the defendants' inferences, how could any

10   plaintiff reasonably do that at a motion to dismiss stage?

11             And, again, I would encourage the Court to look at

12   the case here.  The plaintiffs -- our position was we did

13   not have enough facts to allege this matter at the onset.

14   Even though the plaintiffs were woken up in the middle of

15   the night and even though they were not connected, that was

16   not enough to move forward with a lawsuit here, and so they

17   didn't.  Instead, what they did is they requested the

18   records --

19             THE COURT:  I understand, but I'm not quite sure

20   what that has to do with me viewing this complaint on the

21   videos, on their own four corners.  The history of

22   Minneapolis trying to prevent you from getting the

23   information is disturbing, but what does that have to do

24   with this?

25             MR. RICE:  Well, I'll tell you precisely, Your

1    Honor, is because the Court's gatekeeping function is to try

2    to process out kind of frivolous claims that the defendants

3    should not be subjected to but allow potentially meritorious

4    claims to proceed.

5         And here, that's what happened during that record

6    request is the plaintiffs were able to get enough

7    information, were able to learn enough and corroborate

8    enough material to say that there is at least a factual

9    dispute, there is circumstantial evidence, there's

10   inferences that should be drawn in their favor because now

11   we have the officers' direct materials.  This is not a case

12   where the officers made a false claim but we don't know why,

13   we don't know whether it could be an innocent mistake or

14   something like that.  We have materials supporting that

15   Williams directly observed the vehicle, and what he claims

16   to have observed was false, and that is -- his false claim

17   is aligned with Schroeder's mutual interest in getting into

18   the plaintiffs' house and arresting them.

19        THE COURT:  Okay.  You have a claim for -- a 1983

20   claim based on the destructiveness of the search, right?  Am

21   I right in understanding that that stands regardless of your

22   Claims 1 and 2 on the validity of the warrant?

23        MR. RICE:  I believe so, Your Honor.

24        THE COURT:  So someone can bring a 1983 claim, not

25   a state law claim or a tort claim, but a 1983 claim based on

1      an unnecessarily destructive search.

2              Do you have any cases that stand for that idea?

3              MR. RICE:  I do, Your Honor.  I could take some

4      time to look them up.  But, essentially, the manner of the

5      search needs to be reasonable.

6              THE COURT:  Okay.  And so regardless of everything

7      else, we have a claim that the SWAT, the breaking down the

8      door, the chaos, the failure to return the cell phone, the

9      damage in the home, are unreasonable and that gives rise to

10     its independent basis for 1983 relief.

11             MR. RICE:  Correct, Your Honor.  That's my reading

12     of the law is that the manner needs to be reasonable, and

13     that would be a separate consideration from the search

14     warrant itself or undertaking the search itself.

15             THE COURT:  Okay.  Your vicarious liability claim,

16     is that a state law claim?

17             MR. RICE:  Correct, Your Honor.

18             THE COURT:  So it doesn't attach to the 1983.  It

19     attaches to the -- okay.  Got it.

20             MR. RICE:  Essentially, it's a state tort claim,

21     Your Honor.  At this time I don't believe we're alleging any

22     sort of direct 1983 liability to the municipalities.

23             THE COURT:  No *Monell* or anything?

24             MR. RICE:  Correct, Your Honor.

25             THE COURT:  Okay.  Thank you.

1            MR. RICE:  Thank you.

2            THE COURT:  Come on up, Ms. Fussy.

3            So I am going to be candid.  I am really troubled

4      by the first argument you raised in your motion to dismiss

5      about res judicata.  You don't have any cases that res

6      judicata, a second case after an attempt to get data.  It's

7      not even the same defendants.  It's not even the same

8      conduct because it is trying to gather information.  It

9      isn't alleging the violation of rights.  You spend pages

10     requiring -- 16 pages by opposing counsel, and you abandon

11     it in a footnote.  So tell me what's up with that.

12            MS. FUSSY:  Certainly.  Yes, we absolutely abandon

13     it.  I had a case years ago in state court with the same

14     kind of -- not a data practices request -- and if I can just

15     say briefly, I feel like the City's reputation is sort of

16     being maligned with respect to --

17            THE COURT:  Yeah, and I want to give you a chance

18     to talk about that.

19            MS. FUSSY:  Okay.  Thank you.

20            So in that case, there was -- when I was

21     researching that case, it was clear that you have -- if you

22     decide -- if you affirmatively decide to bring a lawsuit

23     against a defendant, you have to bring everything that --

24            THE COURT:  Absolutely, but MGDPA is completely

25     different.

1          MS. FUSSY:  I didn't know that.

2          THE COURT:  Okay.  I mean, it seems intuitive to

3     me.  Like when I started reading your argument, I really --

4          MS. FUSSY:  Okay.  But the cases I saw before,

5     they were completely different.  Like you could bring a

6     bankruptcy and employment law.  It wasn't like they need to

7     be the same thing.

8          And then also the research shows that privity

9     argument too.

10         So yes, I brought that argument.  I thought that

11    was the correct argument, and then I read his memo, and I

12    realized he was right and so I thought I did the right thing

13    by saying --

14         THE COURT:  Yeah, you did.  Yeah.  I really

15    appreciate that explanation, and it always takes some

16    hutzpah to fall on your sword and to withdraw an argument.

17         MS. FUSSY:  I don't have any problem with that

18    because my integrity is absolutely everything.  I'm not

19    going to bring a false claim.  And if I think that an

20    officer did something wrong, I'm going to settle the case

21    and I'm going to talk to the chief of police about, we can't

22    do this anymore.  And I did that for two years when I was

23    working on the DOJ and the MDHR stuff.  That was my job.

24    I'm not going to --

25         THE COURT:  Raise a claim that you don't think has

 1    merit.

 2              MS. FUSSY:  Absolutely not.

 3              THE COURT:  All right.  I'm persuaded.

 4              MS. FUSSY:  Well, okay.  And so then can I also

 5    just --

 6              THE COURT:  Yeah, so this is what I really wanted

 7    to hear your take on --

 8              MS. FUSSY:  Thank you.

 9              THE COURT:  -- because the plaintiff characterizes

10    this as, you know, this attempt to hide the truth, this

11    refusal to agree with the court order I think is part of the

12    characterization and everything else.  So I wanted to get

13    your two cents on that.

14              MS. FUSSY:  Thank you.  I totally appreciate that.

15              So when Mr. Rice brought the lawsuit, I talked to

16    our responsible -- the clerk's office that goes through all

17    this stuff and I'm like, what's the deal?  They said it's

18    investigative data.  And so then I talked to our sergeant,

19    Sergeant Albers, and he said that the Hennepin County

20    prosecutors are refusing to release this information.

21              So I read the police report and I'm like, you know

22    who did it.  It's not these guys.  Everyone knows it's not

23    these guys.  So why won't you just release what's related to

24    just them?  I understand that there is data in this

25    complaint.  There are going to be body camera.  There's

1    going to be private investigative data related to other

2    people, but --

3            THE COURT:  Is that what the concern of Hennepin

4    County was, that the investigation was still ongoing or that

5    the --

6            MS. FUSSY:  Yes.  That's what they claimed.

7            THE COURT:  -- the information would affect other

8    defendants?

9            MS. FUSSY:  They claimed that the whole thing was

10   investigative data and they weren't going to release it.

11   And then they strung me along and they're like, we think

12   we've got the guy; we think he's going to confess; we're

13   going to bring him in; blah, blah, blah.  And then I would

14   relay.

15           This was like months.  This was probably like six

16   months -- correct me if I'm wrong, Mr. Rice -- where I was

17   like -- finally I just said, look, I don't care if you have

18   the data; we don't care if you have the data; we want you to

19   have the data; they're not letting us release it; my people

20   won't release it; bring a lawsuit; I won't oppose it.  And

21   that's what happened.

22           And so then after we got the order, which I did

23   not oppose because it's the right thing to do, and also now

24   we're covered because a judge has said give him the stuff,

25   so now what that allowed, though, is not for them to have

```
 1    absolutely everything.  It's what's related to them, right?
 2           And so later, they -- the allegation now is that
 3    we withheld information that they had a right to.  But when
 4    I talked to -- then went back and looked, I was told, well,
 5    this stuff, we didn't know that this would have been
 6    relevant to them.  And so you have different people.
 7           I handed it off to the data practices people to do
 8    their job.  They didn't know, like, the nuances of this
 9    case.  The nuances of this case, there are going to be --
10    then there's videos or some evidence and documents that they
11    didn't have that I felt like, well, this is relevant because
12    this shows where this is or some fact that I put in my memo
13    that I thought was relevant to the determination of whether
14    there was probable cause or whether there was lies or
15    whatever.  And so from that, he's inferring that there is
16    more data out there that they're entitled to, and --
17           THE COURT:  I think he's also implying that --
18    he's inviting me to assume that because it took some time to
19    get this information, that that supports the idea that there
20    are lies.  I think that's sort of the invitation.
21           MS. FUSSY:  Okay.  But let me just say then he
22    would be claiming that the lies are from me or the data
23    practices people?
24           THE COURT:  No, no.  I think it's a bigger picture
25    idea that the reason this is being resisted is because it
```

1    covers up lies.

2            MS. FUSSY:  I think that --

3            THE COURT:  Wrong?

4            MR. RICE:  Your Honor, could I speak for myself?

5            THE COURT:  Sure.

6            MR. RICE:  The reason that the plaintiffs raised

7    the issue of the records primarily is to show that even if

8    partial records are produced, there's still additional gaps,

9    and within those gaps may be relevant materials that

10   undermine the defendants' claims.

11           THE COURT:  I see.  Thank you.

12           MR. RICE:  For example, the body camera video the

13   defendants have produced, that we didn't have original

14   access to, actually supports the plaintiffs' claim in

15   certain aspects.  We would ask the Court to take seriously

16   the gaps in the information before it.

17           THE COURT:  Got it.  All right.

18           So, Ms. Fussy, first of all, I think that you've

19   provided a really not only credible, because I know that you

20   take seriously your duties as an officer to the court, but a

21   persuasive explanation for kind of the backstory here, which

22   isn't really before me but has been hinted at, so I really

23   appreciate you sharing your thoughts on that.

24           I do have some specific questions.  Do you have a

25   case that grants a motion to dismiss on a falsehood claim

1    where there is some -- this isn't just a case where, hey,

2    they got the wrong guy, right?  This is a case where there

3    are some actual inaccuracies in the search warrant.  I'm

4    most troubled -- I'll be candid, I am most troubled by two

5    of them.

6            The claim that he was fleeing.  Nobody said

7    fleeing.  They said, came out, went back in.

8            And I am troubled by the mower is in the back of

9    their house.  It is clearly -- and I really actually

10   appreciated your photograph because it helped me visualize

11   kind of the relationship of these spaces -- the mower isn't

12   in the back of their house.  It is in the neighbor's yard,

13   next to the neighbor's -- so those are the two.

14           You know, I think the phone, we're in a little bit

15   of a potato/potato region about that being right on the line

16   between the driveway.  It's definitely the driveway.  I

17   accept opposing counsel's observation that that driveway is

18   short and that most of the property is behind a fence, but

19   we kind of -- those of us who know St. Paul know that,

20   right?

21           And, frankly, the dog, I'm less persuaded that I

22   can even infer a falsehood.

23           But the mower -- I'm not saying I've decided.

24   I've got a lot of work to do.  But the mower and the fleeing

25   bother me the most.

1          So do you have a case that grants a motion to

2     dismiss when there is pretty credible allegations of a

3     meaningful disconnect between the information known and the

4     way it was put into the affidavit?

5          MS. FUSSY:  Well -- oh, a judgment on the

6     pleadings?

7          THE COURT:  Yeah, something at this stage as

8     opposed to the SJ stage which, as we know, is a pretty

9     important distinction.

10         MS. FUSSY:  Yeah.  I mean, that is a great

11     question, and I feel like that's a constant question that I

12     get from the judges.  And my thought for that is I don't

13     really think the analysis is different.  The difference

14     is --

15         THE COURT:  Of course it's different.

16         MS. FUSSY:  -- you accept the -- but can I just --

17         THE COURT:  Inferences.  I can fill in those gaps

18     on --

19         MS. FUSSY:  But you have to at least allege it,

20     right?  And they're not alleging the affirmative facts that

21     are needed here.  And so then once that happens -- if they

22     allege these facts -- not conclusions, right, but facts and

23     reasonable inferences that rely from them, then there is no,

24     in my opinion, distinction on the law that you follow after

25     that.  The issue is, what do you accept as true?  What are

1        you required to accept as true?

2               But then on top of that, there's sort of an added

3        layer of these deliberate falsehood cases.  And if you look

4        at *Morris v. Lanpher*, it really lays it out.  And I

5        apologize, when I look at the brief, it did not lay this out

6        clearly, but I'm sure you already know all this.

7               THE COURT:  Don't be so sure.

8               MS. FUSSY:  No, believe me, you do.

9               So number one, it's the plaintiffs' burden to show

10       not only a deliberate falsehood but then also -- it's two

11       things.  The affidavit without the falsehoods would not

12       support the PC.  So what they require is specific --

13              THE COURT:  The corrected falsehood, right?  Like

14       so with the mower -- just making sure I understand, with the

15       mower, it's not that you have to pretend there's no mower.

16       It's that you have to specify that the mower is in the

17       neighbor's backyard.

18              MS. FUSSY:  Yeah.  I mean, that's even better

19       facts for me, right?  You don't have to take the mower out

20       of the equation, yeah.  So there's that.

21              So my thought is -- but it's plaintiffs' burden

22       and then put on top of that the *Iqbal* requirement, right?

23       Where are the affirmative allegations that there's any

24       deliberate -- deliberate intentional falsehood, right?

25              So if I could direct you to page 6 of my memo,

```
1    that shows the aerial photo, right?  And so if you look at

2    that and then you cross-reference it with page 4 of my

3    memo -- now, if you look at page 4, there's a red car that's

4    right behind a white garage.  That's the neighbor's -- no,

5    that's their property, right?  So then you see the phone is

6    right there.  It's right next to this house.

7              But now if you look over again at page 6, they

8    refer to that as an alley but, like, where does the alley go

9    to?  There's no outside -- it literally looks like a

10   driveway to me because it's on their property and it doesn't

11   extend all the way through, so it behaves as a driveway.  It

12   doesn't even behave as an alleyway.

13             THE COURT:  That little stop?

14             MS. FUSSY:  Yeah.  Like if you go --

15             THE COURT:  I think we're assuming that's the

16   driveway in question.

17             MS. FUSSY:  Yeah.  So I don't understand how it's

18   not even in the alley then.

19             THE COURT:  The fact that it's on the line between

20   the driveway -- I'll allow Mr. Rice to correct me if I'm

21   misapprehending, but I think that what he's arguing is that

22   it's said to be in the driveway.  It's not that that

23   shouldn't be characterized as a driveway.  It's that the

24   actual location of the phone isn't in a driveway.  It's on

25   the line -- at most, on the line between the driveway and
```

1    the alley, which is as consistent with tossing something out

2    the window as it is with pulling into the garage or near --

3    you know what I mean?

4           So I don't think he's quibbling with whether that

5    stumpy thing is a driveway.  I think his point is the phone

6    actually isn't in the driveway in an incriminating way.  It

7    is right on the edge in a publicly accessible way.  I think

8    that's his argument.  And you can kind of see it on the body

9    cam.

10          MS. FUSSY:  Okay.  So then the issue is then if

11   you look at page 4, you see like past where the -- yeah, I

12   mean, maybe it's on the line -- fine, it's on the line.  But

13   I don't know that if you look at the search warrant then, if

14   that's like such a deliberate falsehood that would

15   materially change anything.  That's where it is.  But I

16   guess you got there already.

17          Now, with respect to the lawn mower, yeah, it was

18   definitely in their yard.  And the only thing I can think

19   of, and I don't have any way around this, is that perhaps

20   the officer thought it's behind their house right next to

21   it.

22          But you're right, should have said "in the

23   neighbor's yard."  Unclear that he ever saw the lawn mower

24   and where it was.  There's no evidence that he ever looked

25   over into the neighbor's yard.  The neighbor --

1           THE COURT:  You have a still of that mower.  Is

2    that not from Schroeder's body cam?

3           MS. FUSSY:  I don't recall having a still.  We

4    have a still of showing where the lawn mower was found, but

5    the still shows -- it doesn't show in someone's yard.  It

6    shows, again, that same area on page 5 of my brief, which if

7    you look at it in color, it would be a lot better than the

8    black and white I have, but it's that same thing where

9    they're basically showing behind the houses.  They said it

10   was tucked in behind the garage.  That is, inartfully, in

11   the rear of their house.  It's just also adjacent.

12          THE COURT:  Doesn't it say "tucked in behind the

13   neighbor's garage"?

14          MS. FUSSY:  Yes, yes.

15          THE COURT:  So we have "tucked in behind the

16   neighbor's garage" turning into "in the rear of their

17   house."

18          MS. FUSSY:  Yeah.

19          THE COURT:  We have, "walking out the door, seeing

20   police and going back in" turned into "fleeing."

21          And then we have allegations -- I know you say

22   there's no allegations.  Paragraph 61, "Falsely claimed that

23   he attempted to flee."  Paragraph 60, "Falsely claimed that

24   the victim's lawn mower was located in the rear."  Paragraph

25   59, "Falsely claimed the dog" -- I've expressed some

1    questions about the dog lineup, but --

2              MS. FUSSY:  If I may talk about the flee then

3    because I don't feel like I have a very strong argument for

4    the lawn mower.  It was not correctly stated where it was.

5              Now, the flee, though, think about this:  When you

6    watch the video, those dogs are barking for at least 20

7    solid minutes in the middle of the night.  They have

8    officers with their lights flashing.  They have another

9    officer on a PA system that's telling the occupants of that

10   house to come out through the front door with your hands up

11   repeatedly, repeatedly, repeatedly, repeatedly.

12             Does he come out the front door?  No.  Does he go

13   when other neighbors are coming around to see what's

14   happening?  No.  And this is where I talk about his

15   subjective belief of what he's doing doesn't matter.  It's

16   where the objectively reasonable officer.

17             I completely believe everything he said he was

18   doing.  He probably didn't think this had anything to do

19   with him.  Maybe he's a sound sleeper, right?  None of that

20   really matters.  I mean, it does matter because it's

21   probably the truth, but if you look at what an objectively

22   reasonable officer knows, he doesn't know what's going on in

23   that guy's head, he doesn't know why he's doing it, because

24   he can't know.  You can never know, right?

25             So here --

1           THE COURT:  But it's not even fast.  I mean, he's

2     not like, ah, you know, or slamming or running.  Attempt to

3     flee is so --

4           MS. FUSSY:  So he goes out the back door, and then

5     the deputies tell him to put his hands up, and he goes back

6     in the front door.  So why is he going out the back door in

7     the first place?  He's told to go out the front door.  That

8     looks suspicious.  He characterizes that as a flee.

9           Now, in our brief, I will say we stated that the

10    deputies stated that he had tried to flee, and that is not

11    correct.  I talked to my co-counsel about this.  I'm like,

12    where is that in the -- he should have use the word

13    "described" because then when he said, "They said these

14    words," I'm like, that's not saying "flee."  That's

15    describing these actions.  So that was incorrect.  We should

16    have used the word "described," and we used the word

17    "stated."  They didn't state it, that's absolutely correct.

18          THE COURT:  And we have that on the body cam,

19    right?

20          MS. FUSSY:  Yes.

21          THE COURT:  Okay.  I haven't watched that part

22    yet.

23          MS. FUSSY:  Yeah, you can hear them saying it in

24    the -- yeah.

25          THE COURT:  Okay.  So do you have any insight on

1    how I'm supposed to interweave the general rule about

2    subjective intent doesn't matter, with a test that -- and I

3    understand it's a big-picture 1983 rule, but how do I weave

4    that in with a test that requires deliberate falsehood and

5    reckless disregard, which are classic mens rea which require

6    intent?

7              MS. FUSSY:  You're right, absolutely right.  And I

8    think that you're right, because it requires the mens rea, I

9    looked at the cases again -- I looked at a great Sixth

10   Circuit --

11             THE COURT:  You should slow down too because we

12   are -- I am too -- fast talkers.

13             MS. FUSSY:  I got excited.

14             I looked at a great Sixth Circuit case, and they

15   kind of laid out -- and I know that's not our jurisdiction,

16   but they interpreted Supreme Court cases so I thought it

17   seemed relevant, and they lay it out.  There is definitely a

18   difference.

19             THE COURT:  Can you tell me that case because I'm

20   constantly trying to understand in some of these contexts --

21   Mr. Rice raised a really good analogy with the whole intent

22   to restrain versus intent to disperse in those Fourth

23   Amendment kind of crowd control-type cases, which really

24   seems to get into a subjective intent.  But that is more,

25   would a reasonable -- could you infer that somebody doing

1        these things has intent to restrain or intent to disperse,

2        whereas here, I have to decide that the officer, Officer

3        Schroeder, used a deliberate falsehood.

4                So can you give me that Sixth Amendment cite?  Do

5        you have it handy -- or Sixth Circuit cite?

6                MS. FUSSY:  Yes.  It's on Westlaw on my computer.

7        I can pull it up.

8                THE COURT:  Okay.  That would be great.  It's more

9        educational than binding.

10               MS. FUSSY:  Yes.  It laid out a really nice

11       analysis for me.  And only then did I fully understand what

12       *Morris v. Lanpher* was actually getting at, and only then did

13       I realize that our brief did not lay it out very nicely.

14               So I'm sorry.  Is there a question?

15               THE COURT:  No.  I was more musing about a

16       difficult-to-integrate set of questions.

17               MS. FUSSY:  Yeah, yeah, yeah.  So I absolutely

18       agree.  So I suppose that like it's probably a mixed bag

19       where sometimes when you're looking at these are the facts

20       and what would an objectively reasonable officer think of

21       when they think -- or think of when they think of these

22       facts and then does that gel with someone who negligently

23       made a mistake or someone who intentionally put in a

24       falsehood.

25               But the other thing that we haven't discussed

 1    here, although you did mention it, though, is the whole
 2    thing with the dog and possibly the lawn mower too, is --
 3    but I don't know for sure about that one -- is that these
 4    are facts that are coming from Williams to Schroeder and
 5    then coming from another set of deputies to Williams to
 6    Schroeder.  And as you talked about, it's the collective
 7    knowledge.
 8            So the whole thing about the dog, yeah, I'm sure
 9    it wasn't the same dog, but he gets to rely on that
10    information.
11            THE COURT:  Schroeder.
12            MS. FUSSY:  Schroeder does, yeah.  And see, that's
13    why now if Williams had been a City of Minneapolis -- well,
14    the issue is with Williams at this point, with all due
15    respect, like whether -- and I'm not saying that he didn't
16    make a mistake --
17            THE COURT:  If Williams lied to Schroeder, I don't
18    know if that's actionable or not, but Schroeder was entitled
19    to rely on Williams saying it's the same dog, I'm 100
20    percent sure.  That's your argument.
21            MS. FUSSY:  Yeah.
22            THE COURT:  Okay.  So one of the things I'm also
23    grappling with in trying to operate this analysis is the
24    idea of collective knowledge, when you can rely on it and
25    when you can't.  So it sort of seems like a one-way ratchet,

1    and maybe that's what the law is, meaning Officer

2    Schroeder -- is it Schroeder or Schroeder?

3              MS. FUSSY:  I don't even know.

4              THE COURT:  Okay.  Officer Schroeder is entitled

5    to -- we can assume that everyone has the collective

6    knowledge of everyone.  In fact, when we consider probable

7    cause for an arrest, we're supposed to kind of engage in

8    that.

9              MS. FUSSY:  As long as there's some amount of

10   communication, correct, Your Honor.

11             THE COURT:  But for arrest, even if you can't

12   trace this nugget to that person, you can still have the

13   collective knowledge.

14             But we don't get the collective knowledge of a

15   falsehood.  So if Williams is lying -- let's hypothesize.

16   I'm not saying Officer Williams is lying or not lying.  But

17   hypothetically, if Williams is lying about the dog,

18   Schroeder is entitled to accept his knowledge, but he is

19   never burdened with knowledge of his lie.

20             Do you see what I mean about the one-way ratchet?

21             MS. FUSSY:  Well, I suppose if Williams said

22   something like, "Hey, how about we say it's the same dog,

23   huh?"

24             THE COURT:  That's kind of what Mr. Rice says he's

25   saying.

1        MS. FUSSY:  But he doesn't allege it, number one.

2    And number two, there's nothing to suggest that that's the

3    case.  There's no allegations.  There's nothing in the

4    body-worn camera.  I mean, they're on camera, that's 100

5    percent the dog.

6        THE COURT:  Okay.  Let me see.  I think I had one

7    other question for you.

8        And whatever the falsehoods are have to alter the

9    probable cause analysis.  So let's say I rewrite this

10   warrant, in my head.  You know, I did a lot of signing of

11   warrants as a magistrate judge, and then I did a lot of

12   reviewing of warrants as a magistrate judge.

13       So if I rewrite the warrant with the correct

14   things:  You know, the lawn mower was in the rear of

15   somebody else's house; the phone was on the line between the

16   publicly accessible parts of the defendants' driveway and

17   the alley; the defendant -- while being yelled at to come

18   out the front, the defendant came out the back; was told to

19   put his hands up, didn't put his hands up and walked back

20   in.

21       If I find that that all still constitutes PC, it

22   doesn't matter under the law if I find an intentional lie --

23   again, hypothetical -- because the intentional lie didn't

24   lead to the search, right?

25       MS. FUSSY:  And I apologize if I'm like not fully

1    understanding, but I think it's actually -- it has to be a

2    deliberate falsehood by the person who wrote the search

3    warrant, plus that would have to make a difference in the

4    termination of when it's -- if there would be PC or arguable

5    probable cause here.  That's what --

6          THE COURT:  Okay.  So let me clean up my analogy.

7    Let's say we have a case where a cop deliberately lied and

8    wrote the search warrant.  He's the affiant.  He lied.  But

9    when I fix the lie, the remaining stuff is still sufficient

10   to establish probable cause.  Then this claim on the

11   false -- so even finding the falsehood is not enough, it has

12   to undermine PC.

13         MS. FUSSY:  I agree, yeah.  Yeah.  That's the

14   case.

15         THE COURT:  And I know that you disagree with me

16   about whether it matters, but you don't know of a motion to

17   dismiss case that dismisses a falsehood allegation in our

18   district or anywhere?  I think that's a little telling.

19         MS. FUSSY:  Well, okay, but also then can it

20   possibly be clearly established, if we can't even find a

21   case, that's saying it's the other way?

22         THE COURT:  Well, it is clearly established --

23   it's clearly established, would you agree, that an officer

24   who applies for a warrant using a deliberate falsehood or in

25   reckless disregard of the truth violates the Fourth

 1    Amendment?  Would you agree that's the qualified immunity

 2    question?

 3             MS. FUSSY:  Yes.  But if I can add a layer on top

 4    of that, whether the falsehoods would not support PC is

 5    going to be based on whether it was clearly -- it's the

 6    second part.  Deliberate falsehood, yes, for sure, as it

 7    should be.  The second requirement, whether the falsehoods

 8    would not support -- you know the language.

 9             THE COURT:  Right.

10             MS. FUSSY:  That has to be --

11             THE COURT:  But I'm not sure whether that's in the

12    qualified immunity overlay or in the violation of rights

13    overlay, but it kind of doesn't matter because it's fatal to

14    the claim either way.

15             MS. FUSSY:  Yeah, I agree, but I think it does

16    matter.  Like, I don't think we should lose our qualified

17    immunity simply because there's this other standard that's

18    also very exacting and difficult.

19             THE COURT:  Okay.  So let's include it in there.

20    Was it clearly established that an officer who applies for a

21    warrant using a deliberate falsehood or in reckless

22    disregard of the truth and had the truth been included, the

23    warrant would have failed to establish probable cause, does

24    that officer -- or was it clearly established that such an

25    officer violates the Fourth Amendment?  Would you agree that

1    that's the test?  I mean, there's no question that is

2    clearly established.

3            MS. FUSSY:  Yes, that is.  But then when you look

4    at, okay, well, would the changing and -- you know, the

5    accurate allegations have supported PC, that's where the

6    clearly established lies, I think, but --

7            THE COURT:  I agree.  So we include it all.  Was

8    it clearly established that that two-part test is true?

9            Okay.  So sometimes I hear your point about, in

10   the qualified immunity context, that a lack of cases

11   undermines clearly established.  Like, you know, I was just

12   grappling with a pepper ball question, right?  The lack of

13   cases arguably undermines clearly established in certain

14   contexts.

15           But that's not what we have here.  We don't have a

16   question mark about how clear the law is.  The law is --

17   it's hard to say in one sentence -- but I think we all agree

18   that it's clearly established that if there's a lie, a

19   deliberate falsehood or recklessness, and if you fix the

20   falsehood, it undermines probable cause, that violates the

21   Fourth Amendment.  So the lack of motion to dismiss cases

22   actually has no bearing on whether that law is clearly

23   established.  It is clearly established that that is the

24   rule.

25           What I'm saying is the lack of motion to dismiss

1     cases kind of plays into Mr. Rice's observation that when

2     you're pleading a case, the best you can do is point to the

3     things that are false and allege intent.  Until you depose

4     Officer Schroeder and Officer Williams, it's very hard to

5     get, yeah, we thought if we bolstered the dog, that would

6     get us into the house.  They don't have that access.  So

7     instead they can line up a bunch of alleged clear

8     falsehoods, some of which are worse than others, as we've

9     kind of kicked around, and say, he knew it was false.

10             Isn't that enough to survive a motion to dismiss?

11             MS. FUSSY:  I don't think so, not under *Iqbal*.

12             THE COURT:  So imagine a case where a guy has

13     nothing but this much evidence, which is pretty standard --

14     I mean, more than -- how does he establish that Officer

15     Schroeder lied on purpose when he characterized the guy

16     coming out and going back in as flight when nobody else did,

17     or when he characterized "behind the neighbor's garage" as

18     "in the back of their house," when nobody else did?  What

19     more could he be expected to plead other than paragraph 60,

20     falsely claimed?

21             MS. FUSSY:  Well, first, it's not our burden, as

22     you know, to establish what he needs to show for affirmative

23     facts, but I've already said there are plenty.  On the

24     video -- let's say the body-worn camera video says, hey, how

25     about we say we saw three guys that went into the house from

1    this car that was running right after the murder, how about
2    we say that?

3                THE COURT:  He points out that the video didn't
4    start running right away.

5                MS. FUSSY:  Yeah, but you find out exactly where
6    the phone is.  So he didn't allege that Schroeder knew.  He
7    says, and I -- it's right from the complaint, "Williams
8    claimed that he observed three black males."  There's
9    nothing saying Schroeder knew it wasn't right because X, Y,
10   Z.  "Williams claimed he saw a small- to medium-sized dog,
11   about knee high, with the men."

12               Okay.  So here's another thing that he could have
13   showed that it was completely wrong.  Let's say that they
14   have a picture and they have a Pomeranian that's -- or not a
15   Pomeranian.  They have a Great Dane.  That's not a
16   medium-sized dog, right?

17               "Williams claimed two of the men entered the
18   victim's vehicle.  He claimed that after a few minutes" --
19   all of these things -- he's claiming Williams said these
20   things.

21               THE COURT:  It's later on that he says false,
22   right?  It's paragraphs, like 61, 62, 63, falsely claimed.
23   They conspired to say, falsely claimed, falsely claimed.
24   Not just was wrong.  But false.  Falsely asserted.

25               MS. FUSSY:  That's a conclusion.  What supports

1    that?  *Iqbal* says you have to have something more than just

2    claiming they must have lied.  You said that yourself.

3            THE COURT:  Yeah, but I was questioning the other

4    guy.

5            Okay.  Thank you.  Anything else you want to point

6    out?

7            MS. FUSSY:  If I could just point out real

8    quickly, regardless of what you determine with respect to

9    Officer Schroeder, there's nothing in the complaint that

10   alleges Albers, Greer, Clark, or Haugland would have had any

11   reason to know anything wasn't exactly as laid out in the

12   search warrant.  There is no constitutional vicarious

13   liability.  It doesn't exist.  And there's no state tort

14   claims in the complaint.  So the City of Minneapolis is out.

15           THE COURT:  Okay.  Hang on, hang on, hang on.  We

16   do have --

17           MS. FUSSY:  Did I read the complaint wrong?

18           THE COURT:  Well, no, I'm not saying that.

19           We have conversion.  Conversion of property,

20   that's a state law claim, right?

21           MS. FUSSY:  Let me see.  I apologize.  Maybe he

22   pled it in a way that appeared to be --

23           THE COURT:  Although conversion through

24   intentional destruction of property.  And that's the

25   state -- I think that's the -- and false arrest and

1    imprisonment.  So those are --

2              MS. FUSSY:  All right.  Yep, got it.

3              THE COURT:  But let's talk about Albers, Greer,

4    Clark, and Haugland.  You're saying that -- so he alleges

5    that those actors were involved in the arrest.

6              MS. FUSSY:  He alleges that they transported them.

7    He alleges another one of them questioned them.  There's

8    nothing in there to suggest that any of them would have had

9    any knowledge to suggest that Schroeder was making a

10   "deliberate falsehood" with respect to any of the facts.

11             THE COURT:  But when it comes to the arrest as

12   opposed to the search warrant --

13             MS. FUSSY:  They're allowed to have collective

14   knowledge, and if the collective knowledge is from Schroeder

15   saying, yeah, we're arresting them --

16             THE COURT:  But do we know that?  Does he allege

17   that Schroeder is the decider on arrest?

18             MS. FUSSY:  You can hear on the body-worn camera

19   that Schroeder is talking to some other guy who says --

20   presumably his superior, who says, okay, bring him out;

21   we're going to bring him out and arrest him.

22             THE COURT:  So you're saying that in order for the

23   claims against the other guys to have legs, he would have to

24   allege that they knew that there wasn't enough to arrest

25   them, and he doesn't allege that.

1          MS. FUSSY:  He would have to know that the

2     deliberate falsehoods weren't correct or, like, they would

3     have to have reason to suspect, at the very least, that

4     those were not true.

5          THE COURT:  Okay.  Thank you.

6          MS. FUSSY:  Thank you, Your Honor.

7          THE COURT:  Okay.  Mr. Rice, I've got a couple of

8     questions, but the first one is:  Did you want to fix my

9     characterization of the driveway/alley thing?

10          MR. RICE:  Your Honor, the plaintiffs' position is

11     I think consistent with what the Court has been saying, that

12     the information needs to be reasonably accurate.  So if

13     Schroeder had said that the phone was found at the

14     intersection of the driveway and the alley, the plaintiffs

15     would be satisfied.

16          THE COURT:  I guess what I mean is, do you agree

17     that that stumpy thing is what we're calling the driveway?

18          MR. RICE:  So the bigger issue, Your Honor, is

19     just that Schroeder should have explained that it was at the

20     intersection of the driveway and the alley, or at least

21     acknowledged that it was within proximity to the alley as

22     well.

23          THE COURT:  Your point is not that that thing

24     shouldn't be called a driveway.  It is that junction

25     argument.

```
 1          MR. RICE:  Correct, Your Honor.  Kind of like the

 2    rear of the plaintiffs' house.  While technically the lawn

 3    mower was -- you know, if the plane was drawn at the rear of

 4    the plaintiffs' house, it was behind that plane, but you

 5    left out essential information that it was found in the

 6    neighbor's yard.

 7          Here, the essential information that's missing or

 8    mischaracterized is it wasn't found solely and completely in

 9    the driveway.  It was found where the driveway and the alley

10    essentially meet.

11          THE COURT:  So I've been looking and looking at

12    your complaint and, you know, you say they conspired.  You

13    say they had evil intent.  You say they -- well, with

14    respect to the false claims, you say falsely, falsely,

15    falsely.

16          False is something that is untrue, but false isn't

17    necessarily something that is knowingly untrue.  That's why

18    when we've got like a false statement prosecution, there has

19    to be an additional element of intentionally.  You don't say

20    intentionally lied.  You just said, untrue, untrue, untrue;

21    falsely claimed, falsely claimed, falsely claimed.

22          MR. RICE:  I believe in the complaint we also did

23    note that they conspired, though, to effect the purpose of

24    an unlawful search and arrest of the plaintiffs.

25          THE COURT:  But you don't say, "Knowing it was
```

 1     false, Schroeder said" or "Knowing it was false," do you?

 2              MR. RICE:  Well, I said that he made the false

 3     claim and that it differed and that he had this intention to

 4     use the false information to effect unlawful circumstances.

 5              I think it's a distinction without a difference,

 6     Your Honor.  The fact -- I believe, though, if nothing else,

 7     it would be a reasonable inference that if an officer has a

 8     purpose to effect something unlawful and makes a false

 9     statement to do so, that at this stage, certainly the

10     plaintiffs would be entitled to an inference that the

11     officer knew it was false and did that to further the

12     purpose.

13              THE COURT:  So when you say -- you're asking me to

14     go there from like paragraph 89, acted with evil intent or

15     reckless indifference, or are you drawing it from your

16     conspiracy claim, Count 4, caused the unlawful arrest by

17     providing false and misleading information, knew that

18     probable cause to arrest -- were under arrest, knew that it

19     wasn't there and then conspiracy, conspired to engage in

20     unlawful search, provided false information.

21              That's where you get an allegation that they did

22     this intentionally as opposed to repeated misstatements?

23              MR. RICE:  Correct, Your Honor.  I mean, it's the

24     plaintiffs' position that the complaint, certainly read as a

25     whole, alleges that Officers Schroeder and Williams knew

1    that the information was false and intentionally provided

2    that information to effect a search and an arrest that did

3    not otherwise have cause.

4            THE COURT:  Okay.  Anything else you want to point

5    out?

6            MR. RICE:  A couple things, Your Honor.

7            First, I know we're not here to talk about the

8    MGDPA lawsuit, but I will just note to the Court that the

9    plaintiffs did have extensive discussions with Minneapolis

10   about the res judicata and MGDPA proceedings, and I would

11   push back to the extent that the Court or others would

12   suggest that the plaintiffs' concerns about that are

13   unfounded or misplaced.

14           THE COURT:  Wait.  About the res judicata argument

15   or about not getting enough information?

16           MR. RICE:  Both, Your Honor.  So --

17           THE COURT:  So Ms. Fussy has explained that, you

18   know, she thought she had a good argument, she read your

19   brief, she was persuaded that she didn't have a good

20   argument, and she decided to not pursue it.  So you won.

21           You want me to infer more?

22           MR. RICE:  I'm just saying, Your Honor, that we

23   had extensive discussions on that issue.  I provided, you

24   know, citations and law to their office about that matter,

25   and they still proceeded with bringing the motion and

 1    asserting the arguments.

 2            THE COURT:  Okay.

 3            MR. RICE:  And then regarding the documents, the

 4    video that was not turned over, again, there were extensive

 5    discussions about searching for additional materials and

 6    getting things like the video that was attached to their

 7    answer, and those were not provided until it was attached to

 8    their answer.

 9            And, again, I know it's a collateral issue, but I

10    would just like to assert that the plaintiffs' concerns were

11    founded and the plaintiffs did communicate their concerns,

12    and they were not resolved until the reply brief by the

13    defendants.  But at this stage, the plaintiffs are satisfied

14    that that issue has sufficiently been put to bed.

15            THE COURT:  So you believe you have all the body

16    cam video?

17            MR. RICE:  We don't, Your Honor, but we believe we

18    have what we're going to get and we have enough to proceed.

19            THE COURT:  You think there's body cam video that

20    you don't have?

21            MR. RICE:  It would not surprise us, Your Honor,

22    because at every stage we have asked for reports from the

23    municipalities.

24            And I will also push back on Minneapolis'

25    contention that they couldn't disclose the materials,

1    because Ramsey County did.  Ramsey County did provide their

2    materials while the other matter was pending, recognizing --

3              THE COURT:  Well, I'm not interested in whether

4    they provided the right stuff at the right time.  Ms. Fussy

5    advocated hard to get her hands on things.  She was dealing

6    with multiple agencies.

7              And at this point, my question to you was not,

8    what did you get when or why?  It was, are there body cam

9    videos out there that you do not have?

10             MR. RICE:  Yes, there is, Your Honor.

11             THE COURT:  Whose body cam video don't you have?

12             MR. RICE:  The Ramsey County officers we don't

13   have, and I believe there will be additional Minneapolis

14   body camera videos as well.

15             THE COURT:  And the Ramsey County officers were

16   involved on the scene.

17             MR. RICE:  Correct, Your Honor.  They're the ones

18   who found the phone in the alley, who identified the dogs,

19   who saw the plaintiff at the back of the house, found the

20   lawn mower.

21             THE COURT:  And have you tried to get those

22   videos?

23             MR. RICE:  I have, Your Honor.

24             THE COURT:  And you assume discovery is going to

25   let you do that?

1            MR. RICE:  We need to go to discovery to get them.

2            THE COURT:  Okay.  Anything else?

3            MR. RICE:  If I could just --

4            THE COURT:  Sure.  Take your time.

5            MR. RICE:  Yes.  Your Honor, so I want to go back

6    and address the Court's question about when is something

7    that's false, you know, intentionally or sufficient.  One

8    thing I would also call to the Court's attention in this

9    case is there were multiple misrepresentations and false

10   claims, and they were all to get to a common purpose of

11   establishing the plaintiffs' guilt, which did not exist.

12   And it's kind of like when you roll a dice once and it

13   rolls --

14           THE COURT:  Are you using the word "false" to say

15   there are multiple things that we now know to be untrue, or

16   are you using "false" to say things that were known to be

17   untrue at the time?

18           MR. RICE:  Well, known to be untrue at the time

19   and are now known to be untrue.  So, for example, when

20   Officer Schroeder claimed that the lawn mower was in the

21   rear of the plaintiffs' house, the allegations are that, and

22   the video supports, that he knew that was incorrect at the

23   time, and we also are here today knowing that it is actually

24   false.

25           But one thing I would point to the Court's

1    attention, though, is it's not -- it's like if you roll a

2    dice -- or a die, and it comes up 6 once, you might not have

3    enough to say that it's loaded because it's one data point

4    and die roll 6s all the time.  But if you roll it five times

5    and it comes up 6 four of those five times, I believe that's

6    the circumstantial evidence that supports that, you know

7    what, it may or may not, but you can at least proceed past

8    this gatekeeping process to determine -- you know, examine

9    the die, do some analysis, roll it more times, et cetera.

10            And here we don't just have one false claim.  We

11   don't just have the dog claim about maybe they made a

12   mistake or he overstated his certainty.  It's the dog,

13   combined with the location of the phone, combined with the

14   lawn mower, combined with the fleeing out of the house --

15            THE COURT:  Do we have Officer Williams' body cam?

16            MR. RICE:  I don't have access to it today, Your

17   Honor.

18            THE COURT:  You don't have it yet?

19            MR. RICE:  I don't.

20            THE COURT:  Do we have Officer Schroeder's body

21   cam for the entire period of time?  When does it start and

22   stop that we have Officer Schroeder?

23            MR. RICE:  So off the top of my head, like I said,

24   we have about an hour after the vehicle is observed and then

25   about -- I think it's an hour before the search warrant, so

1    in that discrete time frame.  I don't know whether that's

2    the complete universe of Schroeder's body camera recordings.

3    There may be recordings that exist in that earlier hour

4    while they're observing.  There may be recordings between

5    that hour while he's preparing the search warrant or gets

6    additional information from officers.  The plaintiffs can't

7    come to the court today with that information.  They've

8    tried.

9           And that's -- again, I don't want to keep harping

10   on the fact that because the plaintiffs tried really hard,

11   they deserve to have their claim go through, but just so the

12   Court can draw the balance properly of what amount of

13   evidence is sufficient to allow plaintiffs to proceed with

14   their claims?  Because, as the Court recognizes, it's a

15   challenging position to state with specificity what actions

16   and discussions officers had about things that the officers

17   would not want to reveal.

18           And I'm just asking the Court to recognize that in

19   those gaps, it is reasonable that the plaintiffs would not

20   have that information or be able to allege that information

21   today, but there's enough circumstantial evidence, there's

22   enough smoke that this seems to be a more viable claim and

23   the plaintiffs should be allowed to proceed to discovery.

24           If the plaintiffs get to summary judgment and the

25   best they can stand on is, well, this claim was false, but

1    we have no information even suggesting that the officers

2    could have, should have known, intentionally falsified

3    things, that's a different analysis.

4              What we're asking the Court today is to take

5    seriously that there are gaps in what's available to the

6    plaintiffs; that within those gaps, it's reasonable that

7    there are materials that support the plaintiffs' claims as

8    the newly produced video attached to the answer does.  That

9    introduced additional elements not previously known to the

10   plaintiffs that support their claims.  That show -- for

11   example in the defendants' opening brief, they ask, "Why

12   would Officer Schroeder make up this stuff about someone he

13   doesn't think is connected to the shooting?"  And the

14   plaintiffs at the time of the complaint didn't have a great

15   answer for that.  "We don't know why they were selected or

16   hand-picked this house as opposed to the lawn mower

17   house" --

18             THE COURT:  I don't think that you have to

19   establish that he believed he was searching the wrong house.

20   You just have to establish that he -- or allege that he lied

21   to get into the house.  He could believe fervently that

22   these were the perpetrators of the shooting that had

23   occurred and still be liable under 1983 for making false

24   statements to get in there, right?

25             MR. RICE:  Yes, Your Honor, but back to the

1    Court's hypothetical of distinguishing every single

2    incorrect or objectively false claim versus the claims that

3    should proceed, which are kind of beyond that.  And here we

4    now.

5            Have additional information that supports this is

6    not just a case where Schroeder followed the evidence and

7    this is just where he ended up.  The video shows he

8    incorrectly believed that this was a north side gang

9    member's house, and he got it in his mind that he needed to

10   get in there and he needed to arrest this Rami person which,

11   again, the plaintiffs didn't know about until they got this

12   video.

13           And because Schroeder believed that, because he

14   wanted so badly to get into this house based on wrong

15   information, that's why the Court should find that the

16   plaintiffs have met their burden, because there is an intent

17   here to, at any costs, get into this house and arrest the

18   plaintiffs.  This is not a case where Schroeder shows up and

19   follows the evidence.  He had a purpose and an objective in

20   mind, and he lied to get to that purpose and objective.

21           And the plaintiffs have pleaded as much as

22   possible to get to that point.  The --

23           THE COURT:  So this kind of undermines your

24   argument that the SWAT was overkill, right?  Like if he

25   believes he's going in there to get a particular person that

1   he believes is both a gang member and in the house and

2   perhaps responsible, regardless of taking out the two named

3   plaintiffs, that puts a different spin on the choice to go

4   in with SWAT, right?

5           MR. RICE:  Yes, Your Honor.  And I will note that,

6   if the Court looks at the complaint, there are no SWAT

7   members who broke the door named in this complaint.  And

8   that is because, with information available to the

9   plaintiffs through their records request, they learned that

10  if you're a SWAT officer arriving at the scene and an

11  officer says, "There's known gang members, they have guns,

12  they're connected to the shooting," and they go and breach

13  the door, to the plaintiffs, that's objectively reasonable

14  for those SWAT officers.  They are not named because that's

15  the type of claim that even if objectively incorrect or

16  false, those SWAT officers were acting -- as far as the

17  plaintiffs could tell, acting appropriately based on the

18  information received and engaging in proper police work.

19          The defendants named for the unlawful manner, I

20  believe, is Williams and Schroeder.  So the officers who

21  knew that the claims were false, who knew that these were

22  not connected -- or there was not evidence connecting them

23  to the shooters, and that's why they're named in the

24  improper manner case because they're the ones who had

25  knowledge that the breaking the door down and sending the

1    SWAT team in was improper.

2            THE COURT:  But they certainly -- you also allege

3    that they believed there's a gang member in there.

4            MR. RICE:  Well, we allege that based on a hunch

5    because there was no gang member there.  There was nothing

6    connecting --

7            THE COURT:  Yeah.  I'm just saying you kind of

8    can't have your cake and eat it too.  Either there's this

9    conspiracy between Williams and Schroeder to get in there

10   because they believe that this alleged bad actor is in

11   there, which would justify using significant force to go in,

12   or they didn't.  Like the fact that supports your conspiracy

13   theory really undermines your "The SWAT was too much"

14   theory.

15           MR. RICE:  Well, the cake and having it too is the

16   difference between subjective and objective.  Here, as far

17   as the plaintiffs can tell on the video, Schroeder sincerely

18   believed that there were wrongdoers and perpetrators in

19   there.  The problem is he didn't have the objective evidence

20   to back it up.  And the case law is clear that an officer

21   can't proceed based on hunch or bare suspicion to get into a

22   place or to arrest people.  And so the unlawful manner is

23   because the objective evidence didn't exist to support the

24   actions that Schroeder caused.

25           THE COURT:  Okay.  That's a kind of fine line, but

 1          I'll leave it there.

 2                  You want, I assume, for me to disregard the many,

 3      many police reports?

 4                  MR. RICE:  Yes, Your Honor.  I think it's

 5      inappropriate to consider them at this stage.  And based

 6      even on the arguments today, it very much feels like a

 7      one-sided summary judgment motion where the --

 8                  THE COURT:  All right.  Thank you, Mr. Rice.

 9                  Ms. Fussy, I've got one more question for you.

10                  You agree I can't consider those 46 pages of

11      police reports?

12                  MS. FUSSY:  You know, what I do think you can

13      consider, Your Honor, is because they're not for the truth

14      of the matter asserted, the Ramsey County deputies, what

15      they said there, because that is imputed to Schroeder's

16      knowledge.

17                  THE COURT:  Yeah, but we're not talking hearsay.

18      We're talking *LeMay vs. Mays* and the Eighth Circuit's

19      admonitions about how it's very different, that generally

20      you can't consider matters outside the complaint, that

21      there's an exception for body cam videos because they tend

22      to capture a more objective reality except to the extent

23      their completeness is drawn into question.  And, frankly, I

24      think *LeMay* is the one that refused to consider a police

25      report.

1          So is there a case that you can point me to post
2     *LeMay* that allows me to consider 46 pages of one side's
3     discovery at a motion to dismiss stage?
4          MS. FUSSY:  No, Your Honor, I don't believe I have
5     a case.  If I can --
6          THE COURT:  Okay.  I cannot consider those under
7     the Eighth Circuit law.
8          MS. FUSSY:  Okay.
9          THE COURT:  I mean, it's not a hearsay question.
10    You understand that, right?
11         MS. FUSSY:  But I think that the problem with --
12    the reason that they -- I understand if it's a one-sided
13    version and it can be incorrect, but the reason I think that
14    you can consider them here is because it doesn't matter if
15    they're incorrect.  It doesn't matter if those Ramsey County
16    deputies are lying.  It's only about what Schroeder knew,
17    and he's allowed to have collective knowledge too of, like,
18    they're saying these things happened particularly.
19         THE COURT:  But this shows one side's version of
20    what Schroeder knew.
21         MS. FUSSY:  I agree.  And it could be wrong,
22    though.  No, no, no.  All I'm saying is Ramsey County's --
23         THE COURT:  No, no.  I'm saying this shows one
24    side's version -- even assuming that these are true or
25    untrue, it showed MPD's version of what Schroeder knew,

 1   whereas if you depose Schroeder, let's say he says, oh,

 2   yeah, Williams and I went over there before we turned on the

 3   body cam video and had a whole conversation about how we

 4   needed to tie the dog in so that we could get into the

 5   house.  That's the other side's version of what Schroeder

 6   knew.

 7           You're asking me to rely on these to establish the

 8   reasonableness of Schroeder's actions.  It's a factual

 9   record that is supporting your theory, and that's what *LeMay*

10   *vs. Mays* kind of really frowns upon.

11           MS. FUSSY:  I understand, Your Honor.  I think

12   we're going to have to agree to disagree on this point.

13           THE COURT:  But you don't have a case that allows

14   me to consider police reports in a context like this?

15           MS. FUSSY:  I don't have a case, correct, I will

16   definitely admit that.

17           And if I could just say one --

18           THE COURT:  Yeah.  I saw you were getting ready to

19   jump up.  I assumed you had one last thing to say.

20           MS. FUSSY:  Thank you.  I just want to say if

21   there's no conspiracy, then there's no deliberate falsehood

22   on the dog.  And plaintiff had said that he wasn't following

23   the evidence, but you have this car that's the victim's car,

24   that's -- they ping the cell phone, and from pinging the

25   cell phone, they find out where the car is, right after this

1   heinous, brutal assault, right?  They see three people.

2   Three people were the perpetrators over here, right, at the

3   attempted murder.

4          THE COURT:  But they see three men, and one of the

5   perpetrators in the attempted homicide was a woman.

6          MS. FUSSY:  We don't know exactly how much the

7   woman looked like a man or not.  We don't know about the

8   sizes.  They're saying there's three people.  They leave

9   here.  They go down the block.  They lose sight of them

10  right at plaintiffs' house, right?  They go down there.

11  They're like, here's the phone, right where we lost them;

12  here's the dog we saw, it's 100 percent that dog.

13         These are all the things that make the probable

14  cause determination at this point reasonable.  That's

15  following the evidence.  There is absolutely -- it's a

16  logical fallacy to say if the officer makes a false

17  statement, therefore, it's deliberate.

18         And I know we talked about, well, what can

19  plaintiffs do?  It's a high standard.  It's a high standard

20  because they don't want to overturn all of these things.

21  It's a high standard because this is not a closing argument

22  when they're putting together an initial investigation,

23  right?  People make mistakes, right?  So they don't want all

24  these things where it's like, you've got the fact wrong;

25  therefore, that's enough to bring a federal case?

```
 1              THE COURT:  Well, he's not arguing he got the fact
 2     wrong.  He points to at least two instances where the fact
 3     was described to him as A, and he characterized it as B, a B
 4     that is much more incriminating.  We've talked about the
 5     fleeing, and we've talked about the lawn mower in the wrong
 6     yard.  Those aren't just, you know, he was told wrong or he
 7     got a fact wrong.  Those are him taking the information he
 8     had, zhuzhing it up to make it more -- I don't know how you
 9     spell "zhuzhing" -- to make it more incriminating and
10     including that.
11              So it isn't just faulting an officer, taking
12     inferences in favor of the plaintiff, which we're supposed
13     to do now.  I'm not saying this is what will bear fruit.  It
14     isn't just faulting an officer for making a mistake in the
15     heat of the moment.  It's suggesting that an officer is
16     mischaracterizing what he knows to make it sound worse.
17              MS. FUSSY:  I think with respect to the lawn
18     mower, that doesn't look right.  There's an argument to be
19     made.  I think it's weak.
20              But with respect to the fleeing, no.  I think
21     that's completely objectively reasonable for an officer to
22     think, in these factual circumstances, that's what that was.
23     He's not coming out.  He's refusing to not come out.
24     They're all in the front yard, as far as he knows.  There's
25     deputies in the backyard that are being quiet.  He tries to
```

1    go out the backyard.  Oh, they're there.  He goes back in.

2    Then he probably is like, well, there's nothing I -- this is

3    from what an objectively reasonable officer would do --

4    there's nothing I can do; I guess I've just got to go out

5    the front and submit.

6         I don't think this is a complete zhuzhing up --

7    which I love the word, by the way -- of calling it a

8    fleeing.  I don't think that that's so beyond the pale to

9    say that that's a fleeing.  That looks like a fleeing.

10        The lawn mower, is it in the rear of their house?

11   It's -- like he says, if you drew a plane, yes.  But you're

12   right, it's adjacent.  It's nearby.

13        So there's like one fact, the lawn mower that, in

14   my opinion, that doesn't come across exactly how it should

15   have.

16        THE COURT:  Okay.  I'm going to wrap this up

17   because I'm already going to be late to a noon meeting in

18   St. Paul, but I really appreciate both of you answering my

19   million questions that are thrown at you in a scattershot

20   manner.

21        Oh, I should give counsel for Ramsey County,

22   Mr. Plaisance, anything you need to chime in?

23        MR. PLAISANCE:  No, Your Honor.

24        THE COURT:  Are you doing other work back there?

25        MR. PLAISANCE:  No, Your Honor.

1                 THE COURT:  I'm just kidding.  I guess that

2      sounded -- it will look meaner on the transcript than it was

3      intended.

4                 Anything you need to share or add?

5                 MR. PLAISANCE:  No, Your Honor, nothing from

6      Ramsey County today.

7                 THE COURT:  Okay.

8                 MS. FUSSY:  Your Honor, may I just email counsel

9      and chambers the name of that case from the Sixth Circuit?

10                THE COURT:  Yes, that would be great, and I don't

11     view that as supplemental briefing because it's more of a

12     theoretical question.

13                Mr. Rice?

14                MR. RICE:  If I could just briefly say two things,

15     Your Honor.

16                The plaintiffs do dispute the description and

17     characterization of the alleged suspects and the location

18     where the officers lost sight of the people seen with the

19     vehicle.  So those are the facts that I think would be

20     improper to rely on at this stage to support the defendants'

21     theories.

22                THE COURT:  Okay.  Thank you very much.

23                And, again, for an excellent argument and for

24     handling my many questions.  I recognize that I kind of poke

25     at weaknesses for both sides in my questions.  It's how I

1    test out what to do.  So I really appreciate your patience

2    and thorough answers.

3            So thank you all very much.  Have a great rest of

4    your day.

5            (Court adjourned at 11:36 a.m.)

6                        *      *      *

7

8

9        I, Paula K. Richter, certify that the foregoing is

10    a correct transcript from the record of proceedings in the

11    above-entitled matter.

12

13                Certified by:  *s/ Paula K. Richter* _____

14                               Paula K. Richter, RMR-CRR-CRC

15

16

17

18

19

20

21

22

23

24

25